## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

DIANE S. P.,*

                  Plaintiff,

v.                                    ACTION NO. 4:17cv143

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                  Defendant.

## <u>UNITED STATES MAGISTRATE JUDGE'S</u>
## <u>REPORT AND RECOMMENDATION</u>

Diane S. P. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, as well as her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 10. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is hereby recommended that plaintiff's second motion for summary judgment (ECF No. 31) be **DENIED** as to counts one and two and that the Commissioner's motion for summary judgment (ECF No. 36) be **GRANTED** as to counts one and two.

                *Plaintiff's last name has been redacted for privacy reasons.

# I.    PROCEDURAL BACKGROUND

Plaintiff, Diane S. P., filed applications for disability insurance benefits and Supplemental Security Income on September 9, 2013, alleging that she became disabled on June 24, 2013, due to severe headaches, severe back pain, high blood pressure, high cholesterol, gastro-esophageal reflux disease ("GERD"), and asthma.[1]  R. 68–69, 176–85.  Following the state agency's denial of these claims, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 68–109, 134–39.

ALJ Irving A. Pianin heard the matter on December 12, 2016, and issued a decision denying benefits on January 19, 2017.  R. 16–24, 29–52.  On October 16, 2017, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–5.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Having exhausted all administrative remedies, plaintiff filed a complaint with this Court on December 15, 2017.  ECF No. 3.  The Commissioner answered on March 9, 2018.  ECF No. 8.  In response to the Court's order, the parties filed motions for summary judgment, with supporting memoranda, on April 19 and May 17, 2018, respectively.  ECF Nos. 11, 15–16, 17–18.  Plaintiff replied to the Commissioner's summary judgment motion on May 26, 2018.  ECF No. 19.

Following the Supreme Court's ruling in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), plaintiff filed a motion seeking leaving to amend the complaint to allege that the ALJ who presided over her hearing was not properly appointed in compliance with the Appointments Clause of the Constitution.  ECF Nos. 20, 22.  The United States opposed plaintiff's motion for leave to amend.

---

[1] Page citations are to the administrative record that the Commissioner previously filed with the Court.

ECF No. 23.  The Court granted plaintiff leave to amend and she filed an amended complaint on October 23, 2018.  ECF Nos. 25–26.

After the parties withdrew their prior motions for summary judgment, the Court entered a new briefing order on November 6, 2018.  ECF Nos. 28–30.  The parties filed new motions for summary judgment, with supporting memoranda including arguments addressing plaintiff's Appointments Clause challenge, on December 6 and January 7, 2019, respectively.  ECF Nos. 31–32, 36–37.  Plaintiff replied to the Commissioner's summary judgment motion on January 18, 2019.  ECF No. 38.  As neither party has indicated special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    *Background Information and December 12, 2016 Hearing Testimony by Diane S. P.*

Born in 1965, plaintiff completed her high school education, and was 48 years old as of the alleged onset date of disability of June 24, 2013.  R. 33, 178.  Although married, plaintiff lived alone at the time of the hearing before the ALJ.[2]  R. 33, 178–79.

Before the alleged onset of her disability, plaintiff last worked on a part-time basis in 2015 and 2016 at an assisted living facility, where she helped with cooking, dishwashing, and resident laundry.  R. 34–36.  Previously in 2013, plaintiff worked full-time as a patient-service representative, checking them in for doctor's appointments.  R. 37–38.

Plaintiff reported suffering from back pain, neck pain, knee pain, severe headaches, fatigue, asthma and bronchitis, numbness in her fingers and hands, arm pain and manipulation problems, and GERD.  R. 38, 40, 45–48.  She described having continuous pain on both sides of her back

---

[2] Unless otherwise noted, the facts recited in this subsection recount plaintiff's testimony about her life and conditions as of the hearing date of December 12, 2016.  R. 31.

and occasional shooting pain down the back of her legs.  R. 45.  She also reported having stiffness and neck pain that radiated into her back.  R. 46.  Plaintiff also said that constant swelling and pain in her knees, dating back many years, made it painful to walk and necessitated bracing herself to avoid falls.  R. 45.

Plaintiff also testified that bilateral hand and finger numbness (two to three times per week for varying time periods) caused difficulty in moving her fingers and shooting pain "up and down [her] arm[s]."  R. 46–47.  Plaintiff also reported an inability to raise her arms above an unspecified height.  R. 38.

Plaintiff also stated that severe headaches left her unable to focus in her last job.  R. 46 (noting also that she had yet to be tested for such headaches).  With respect to GERD, plaintiff testified that reflux causes her to be sick at the first meal of every day.  R. 48–49.  Finally, while noting that she suffers from asthma and bronchitis, plaintiff admitted that she smokes "maybe one or two cigarettes a day."  R. 40.

Plaintiff testified that the foregoing impairments precluded work and her pain has worsened since she last worked.  R. 38, 46–47 (noting this caused her to voluntarily stop working).  She reported that the pain interfered with sleep, caused extreme fatigue, and led her to spend most of her days lying down, searching for a comfortable position.  R. 47–48.  Although previously prescribed Celebrex, plaintiff found it disagreeable and reverted to taking only ibuprofen.  R. 39–40.  She denied having back surgery and stated that she declined a doctor's suggestion for pain-killing injections for the back.  R. 39.  Although she tried physical therapy, plaintiff stopped after finding that it made her back "feel worse."  *Id.*  At the time of the hearing, plaintiff was not receiving any other treatments.  *Id.*

4

With respect to daily activities, plaintiff testified that she laundered, cooked, cleaned, and did housework and chores for herself, "in spells," and with the aid of her sisters. R. 43. Although fearful of falling in the shower, plaintiff said she performs personal care tasks, including bathing, showering, and dressing. R. 44. When not otherwise engaged, plaintiff mostly spends her days watching television and alternating between sitting and lying down. R. 43. When leaving home, plaintiff said that either her son or a friend drives her to the store, doctor's visits, or other locations. *Id.* She denied venturing out alone, due to fear of having another heart attack. R. 44. At stores, plaintiff moves about using a motorized cart and seeks assistance with loading and unloading her cart and car. R. 43–44.

With respect to her exertional abilities, plaintiff said that, due to back trouble, she can lift and carry items weighing no more than five pounds. R. 41. Back pain also limits her ability to sit to an "hour or less." R. 41–42. Plaintiff said she can stand for roughly five to ten minutes before needing to sit. R. 42. Although she used to use a cane, plaintiff reported that she currently held onto furniture, walls, and rails when moving about and going up and down stairs. *Id.* Plaintiff was uncertain how far she could walk, but stated she could walk "a few steps from . . . [her] doorway to the parking lot to [her] car." *Id.*

On October 23, 2013, plaintiff completed an adult disability report. R. 188–97. In it, she traced her painful conditions back to 2003 and said they worsened over time, until in 2013 she no longer could work. R. 189 (reporting she was fired in 2013, after being ill and having two surgeries). She also reported being treated for GERD, high blood pressure, asthma, and high cholesterol and reported taking five prescription medications, in addition to over-the-counter pain medicine. R. 191, 194, 197.

On November 3, 2013, plaintiff completed an adult function report, which, in substantial part, matches plaintiff's hearing testimony. R. 251–58. Plaintiff also reported: (1) sleeping, at most, four to five hours per night; (2) using chairs to avoid standing when washing dishes, cooking, and bathing; (3) driving when free of neck pain, but mostly relying upon others for transportation; (4) going out three to four days per week, when feeling up to it; (5) keeping track of her own medications; (6) handling money and taking care of her own finances; (7) having hobbies such as reading, watching TV, listening to music, and playing games on the computer; (8) performing no yard work; and (9) having fallen several times in her first floor, handicapped apartment. R. 251–56. Plaintiff described her social activities as spending time with family and talking on the phone. R. 255 (noting she also used to sing in a gospel group). Plaintiff checked boxes indicating her conditions limited her both physically and mentally. R. 256 (listing affected functions as lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, memory, and concentration). Aside from using reading glasses, and an electric cart when shopping, plaintiff reported using no other assistive devices, including a cane. R. 254, 257. She reported that she could walk 200 feet, at which point she experiences back pain and leg numbness and needs to rest. R. 256. She reported that constant back pain limited her ability to move about outside of the home and caused her to be forgetful and affected her concentration. R. 256–58.

**B.**     *Relevant Medical Evidence[3]*

**1.**     *Treatment at Community Free Clinic and Hampton Roads
Neurological & Spine Specialists*

Plaintiff began treatment at the Community Free Clinic in Newport News, Virginia, dating back to 2009.  R. 533–35 (noting chief complaints as knee swelling, back pain, and morning stomach issues) 546, 550.

In 2013, the clinic treated plaintiff on January 21 and February 4, for coughing, vomiting, headaches, and general weakness, and for lab results follow-up.  R. 413–14.  On August 8, 2013, when seen at the clinic for medication re-fills for hypertension, hyperlipidemia, and GERD, plaintiff reported that increasing back pain (10/10) was affecting her ability to work, and the clinic ordered an MRI and told her to take over-the-counter pain relievers.  R. 412.   A physical examination revealed tenderness upon palpitation at the sacroiliac joint, positive findings for flexion, abduction, and external rotation, and reduced lumbar flexion.  *Id.*

On September 12, 2013, plaintiff returned to the clinic to review her MRI results and said she was in "extreme pain."[4]  R. 778.  The MRI impressions were:

1.  Advanced facet arthropathy at L4-5 resulting in mild anterolisthesis.  There is uncovered disc and a right posterior disc protrusion mildly distorting the right ventral dural sac.
2.  Advanced facet arthropathy L3-4.  A small annular fissure is present at this level also.
3.  Small round lesion right lateral kidney, nonspecific though possibly a cyst.
4.  Epidural lipomatosis L5-S1.

R. 381–82.

---

[3] Because plaintiff's summary judgment motion raises arguments pertaining to her neck's spinal issues and associated hand and arm impacts, and to the relationship between her morbid obesity and other impairments, the Court focuses upon the treatment records pertaining to such matters.

[4] Plaintiff also reported to the clinic on August 29, 2013 for MRI follow-up, but her results were not yet available.  R. 779.

Following referral from the clinic, R. 778, plaintiff received treatment from Dr. Jackson Salvant, Jr., at Hampton Roads Neurosurgical & Spine Specialists on September 23, 2013. R. 389–91. During this visit, plaintiff reported a history of low back pain that was getting worse and was exacerbated by standing, walking, and movements requiring bending and twisting. R. 389. She reported the pain radiated into the buttock, right leg, thigh, and calf, and had numbness and tingling in her right foot. *Id.* Plaintiff also reported having neck pain that radiated into her right shoulder, with "occasional numbness and tingling in the right hand affecting" her fingers. *Id.*

Dr. Salvant's physical exam revealed, among other things: (1) "significant pain to palpitation along the lumbar spine"; (2) "limited flexion and extension secondary to pain"; (3) "negative straight-leg raise bilaterally"; (4) "normal strength at the hip flexors, knee flexors and extensors, dorsiflexion, and plantar flexion"; (5) "pain with range of motion of the neck"; (6) "equal grip strength"; (7) "equal" and "5/5" "deltoids, biceps, [and] triceps strength"; and (8) "hypoactive reflexes in the upper and lower extremities with no Hoffman response and no ankle clonus." *Id.*

Consistent with the MRI, Dr. Salvant assessed plaintiff with lumbar degenerative disc disease L3-L4 and L4-L5, grade 1 spondylolisthesis of L4 and L5, and right-sided disc herniation at L4-L5. *Id.* For treatment, he prescribed Feldene, physical therapy for the lower back and neck twice a week for eight weeks, and, in the absence of improvement, epidural injections. R. 390–91. When plaintiff returned six weeks later, she advised that she could not afford Feldene and that transportation difficulties impacted her ability to regularly attend physical therapy.[5] R. 392. A

---

[5] After fully assessing plaintiff on October 1, 2013, the therapist indicated that plaintiff's back and neck pain had "potential to improve" and that plaintiff had a "good" commitment to scheduled therapy for a recommended eight to ten weeks. R. 477. Plaintiff, however, never returned after the first visit. *See* R. 39 (stating she stopped attending because it made her "feel worse").

physical exam revealed results consistent with the prior one, except for noting plaintiff's slow and antalgic gait.  *Id.*  Dr. Salvant prescribed a cheaper anti-inflammatory (Mobic) and directed plaintiff to schedule an epidural steroid injection, if the medication failed to provide relief.  *Id.*  As discussed below, plaintiff did not return to see Dr. Salvant until April 7, 2016.  R. 739.

Follow-up examinations at the clinic on December 3 and 17, 2013, reference plaintiff's morbid obesity and the need for weight loss, but contain no significant findings about back, neck, hip, and arm/hand pain.   R. 776–77 (stating that patient "voice[d] no other complaints" on December 17).

Plaintiff next treated with a clinic nurse practitioner on May 22, 2014, when she complained of knee pain and sought a note supporting her desired move to a handicapped apartment.  R. 592 (noting prescriptions received from the emergency room on May 3, 2014 for the same complaints went unfilled for financial reasons).  She received prescriptions for Neurontin and Celebrex.  R. 593.

On July 3, 2014, plaintiff treated with a clinic nurse practitioner and reported having severe pain ("7/10") in her arthritic knees that was only somewhat relieved by Celebrex and Neurontin. R. 773–75 (noting also that plaintiff sought a "housing accommodation form" for a one-story apartment and reported difficulty sleeping due to neighborhood crime).  A physical exam revealed bilateral knee tenderness and swelling.  R. 774.  The nurse practitioner assessed plaintiff with morbid obesity, arthritis at multiple sites, GERD, hypertension, and tobacco use disorder (noting she was an "every day smoker").  R. 773–74.  Plaintiff was "strongly encouraged" to lose weight and quit smoking and to continue taking medications for her other conditions, while waiting to be seen by an orthopedist.  R. 774.

On May 9, 2015, the nurse practitioner again treated plaintiff, who sought medication refills and followed up after emergency room treatment for shingles. R. 770–72 (also complaining of malaise, a left ear earache, and back and joint pain, swelling, stiffness, and arthritis). A physical exam revealed otalgia, myringitis, and a bulging typmpanic membrane, as well as localized back/flank pain (8/10), apparently mostly associated with shingles. R. 770. The nurse practitioner assessed plaintiff with new otitis media (not otherwise specified), new herpes zoster, and unchanged morbid obesity, hypercholesterolemia, and hypertension. R. 770–72 (prescribing Cipro Otic and refilling Gabapentin and continuing prior medications).

On July 28, 2015, the clinic treated plaintiff to follow-up on complaints of chest pain and a recent visit to the emergency department at the Riverside Regional Medical Center ("Riverside RMC") from July 19–21, 2015.[6] R. 758–69. While plaintiff denied continuing chest pain and related symptoms, she sought a prescription for itchiness and associated open sores and medication refills stemming from the emergency treatment. R. 758. The nurse practitioner's physical exam found skin lesions and sores, but no cardiovascular and musculoskeletal abnormalities. R. 759 (listing plaintiff's gait and station as normal). She assessed plaintiff with improved herpes zoster, deteriorating atopic dermatitis, improved myocardial infarction-non-ST elevation, and with unchanged hypertension and prescribed medications, as appropriate. R. 759.

On August 13, 2015, plaintiff followed up at the clinic with Dr. Mark Clark, who noted the absence of "any angina-like chest pain," but continued complaints about a rash on her back, hands,

---

[6] Plaintiff reported to ER complaining of "substernal chest pain." R. 761; *see* R. 756 (noting the pain followed an argument with her boyfriend). After being evaluated and given a battery of cardiac tests, plaintiff's chest pain was diagnosed as resulting from a "[n]on-ST-segment elevation myocardial infarction . . ., probable demand ischemia, unclear etiology." R. 760. After two days, plaintiff was discharged and recommended to "continue on aspirin and Plavix" and follow-up in two weeks. R. 761–62

arms, and legs.  R. 756.  Other than noting her morbid obesity, Dr. Clark's physical examination revealed no abnormal findings and he directed her to continue with prior medications and referred her to a dermatologist.  R. 756–57.

When plaintiff returned to the clinic on September 22, 2015, she complained of the continuing rash, as well as back and knee pain, which had "been painful for [some time]."  R. 753 (noting patient found that physical therapy aggravated her pain).  The nurse practitioner continued the prior cardiac and dermatitis assessments, prescribed new medications for the rash, and directed taking ibuprofen for knee and back pain.  R. 754.

On October 1 and November 18, 2015, Dr. Clark again treated plaintiff.  R. 749–52.  These treatment notes primarily refer to plaintiff's rash and indicate that Dr. Clark suspected that it was induced by medication.  R. 751.  After advised to discontinue use of one drug, the rash appeared to subside, but plaintiff continued to have itching.  R. 749.

During a February 11, 2016 follow-up visit with Dr. Clark, he noted that the rash had improved, but plaintiff was complaining of lower left back pain that radiated down her right leg, with some right leg numbness that interfered with sleep.  R. 746.  Dr. Clark's neurological, musculoskeletal exam notes reported "decreased sensation and strength right leg."  *Id.*  Dr. Clark assessed plaintiff with lumbar radiculopathy and referred plaintiff for an orthopedic examination. R. 747.

Plaintiff underwent another lumbar MRI on February 26, 2016.  R. 743–44.  The exam revealed:

11

1.   Severe hypertrophic facet arthropathy at the L3-L4, L4-L5, and L5-S1 levels[, along with (a) small posterior disc protrusion and mild canal narrowing and mild to moderate bilateral neural foraminal stenosis at L3-L4; (b) broad-based posterior disc protrusion and mild canal narrowing and mild bilateral neural foraminal stenosis at L4-L5; and (c) severe hypertrophic facet arthropathy, with minimal posterior disc protrusion, and no significant canal stenosis or nerve root impingement at L5-S1].
2.   Grade 1 anterolisthesis L4 on L5 and to a lesser degree L3 on L4.
3. Mild degenerative disc disease with small broad-based posterior disc protrusions at the L3-L4 and L4-L5 levels.

R. 743–44; *see* R. 620–21.

In a follow-up with Dr. Salvant on April 7, 2016, in which plaintiff complained of chronic, aching pain, including neck pain, he noted her prior 2013 evaluation for the same problems, namely "lower back pain radiating into the legs . . . right leg pain symptoms going down the leg, pain in the buttock and in the back, pain in the shoulder, occasional tingling in the right hand, and some neck pain."  R. 739.  Dr. Salvant compared the results of the 2013 and recent 2016 MRIs and described them as "identical" and involving "spondylolisthesis L4-5 and facet arthropathy L3-4 . . . ., disc protrusions at L3-4 and L4-5 . . . ."  *Id.*  He noted prescribing anti-inflammatory medication and sending plaintiff to physical therapy in 2013, as well as her failures to take the medication (due to cost), to pursue physical therapy, and to return for treatment, in disregard of his recommendations.  *Id.*

Dr. Salvant's 2016 examination found plaintiff's lumbar spine area unremarkable and noted that, while minimally positive on the right side for the straight-leg test, he attributed this to "bad arthritis in her right knee."  *Id.*  He found she exhibited "[n]ormal strength and reflex activity . . . bilaterally without sensory deficits" and an abnormal gait, due to an inability to comfortably bear weight on her right knee.  *Id.*  Dr. Salvant noted plaintiff received treatment for knee pain from others, had received an injection, and declined to take recommended anti-inflammatories.  R. 741.  Although plaintiff declined a proposed epidural steroid injection, Dr. Salvant ordered one

12

hoping that she might change her mind.  *Id.*  Dr. Salvant noted that morbid obesity precluded spinal surgical intervention at that time.  *Id.*  Instead, he opined that, if plaintiff agreed to the epidural injection, she could then "work diligently on a weight loss program and exercise in order to perhaps have something definitive done about her spine sometime later down the road."  *Id.*  In the meantime, he issued a one-time prescription for Norco to assist temporarily with sleeping, with the understanding that it would not be renewed.  *Id.*

On May 12, June 23, July 14, and October 13, 2016, plaintiff saw Dr. Clark for regular office visits.  R. 731–38.  During these visits, she continued to complain of lower back pain on her left side, which radiated down her right leg and caused some numbness, but refused epidural steroid injection "out of fear."  R. 731, 733, 735, 737.  Dr. Clark also treated plaintiff for complaints of a continuing (but improving) skin rash, a left ankle sprain (on June 23), and for headaches (on June 23).  *Id.*  Dr. Clark continued plaintiff on her prior medications (other than the Norco) and encouraged her to lose weight and stop smoking.  R. 732, 734, 736, 738.

### 2.    *Treatment at Riverside Regional Medical Center*

On March 20, 2014, plaintiff went to the emergency room at Riverside RMC complaining of lower back pain, with sciatica down the right leg, and "flaring" hives.  R. 571, 577.  A history taken from plaintiff indicates that her back condition was "[u]sually controlled by muscle relaxant and pain meds."  R. 577 (noting that patient was unable to refill Flexeril and Vicodin).  A nurse noted that plaintiff complained of severe back pain and associated right leg pain and numbness, due to going up and down apartment stairs.  R. 580.  While plaintiff complained of trouble walking, the nurse noted she "walked into the room without any apparent issues . . . ."  *Id.*  Treatment notes indicate the presence of "[c]urrently . . . moderate" symptoms, "localized to the back."  R. 577.  A physical exam found, among other things:  (1) normal neck range of motion and absence of

tenderness; and (2) a normal back, with the exception of L5 (right) paraspinal tenderness/spasm. R. 578 (noting "[n]o focal neurological deficits on examin[ation]"). The treating physician diagnosed plaintiff with sciatica and a rash and prescribed Motrin, Flexeril, Norco, Atarax, and a hydrocortisone cream. R. 578–79.

On May 3, 2014, plaintiff returned to the emergency room complaining of bilateral knee pain that began one month earlier. R. 570, 584, 601. A physical exam, including of plaintiff's neck and upper and lower extremities, revealed normal findings. R. 602. While ambulating, plaintiff exhibited a limp and an unsteady gait. R. 585. X-rays revealed the existence of degenerative joint disease in the knees. R. 585, 587–88. The right knee x-ray revealed "[m]oderate medial and lateral compartment, and severe patellofemoral compartment osteoarthritis." R. 587. The left knee x-ray revealed "[t]ricompartmental degenerative changes, most prominent in the patellofemoral compartment, compatible with osteoarthritis." R. 588. Upon discharge, plaintiff was directed to see her doctor concerning arthritis and weight loss, received a prescription for diclofenac, and was observed "ambulating without assistance, driving self." R. 584–85.

On August 9, 2014, plaintiff returned to the emergency room complaining of back and left leg pain, but was ambulatory and exhibited a steady gait. R. 623, 625. A physical exam of plaintiff's back revealed normal inspection, normal range of motion, limited by pain, and paraspinal tenderness in the lower back. R. 624. The lower extremity exam also revealed normal range of motion and listed back and lower left extremity pain with movement. *Id.* After treatment, plaintiff was discharged with prescriptions for Flexeril, Naprosyn, and Norco, and told to follow up with her doctor for weight loss assistance. R. 624–25.

On December 5, 2014, plaintiff's cervical spine was x-rayed to assess for cervical radiculopathy. R. 614. The reviewing radiologist noted "[d]egenerative disk changes at C5-6"

14

and "[s]traightening of the normal cervical lordosis which may reflect muscle spasm." *Id.* On January 16, 2015, plaintiff's received hip x-rays. R. 615. The reviewing radiologist found no evidence of fracture or dislocation, but noted the presence of "[m]ild to moderate osteoarthritic change." *Id.*

Plaintiff received treatment at the emergency room on March 4, March 22, May 30, July 4, August 24, and October 23, 2015, and received treatment for abdominal pain and right upper quadrant pain radiating to her back, shingles, post-shingles neuropathy, and rashes. R. 629–37, 645–49, 652–55, 657–60, 692–95, 704–07. On March 4, 2015, plaintiff complained of right upper quadrant pain, radiating to her back during the prior week. R. 629, 634 (rating pain as 9/10). A physical exam conducted on March 4 revealed mostly normal findings, except for continued midline to upper back tenderness and mild abdominal tenderness to the right upper quadrant. R. 630. Physical exams conducted on March 22 and May 30, 2015 revealed normal range of neck motion and the exam on March 22 also revealed normal range of back motion, without tenderness, and normal inspection and range of motion for the upper and lower extremities. R. 646, 653; *but see* R. 654 (noting patient complaint of right side and right upper leg pain). A physical exam conducted on July 4 also revealed normal range of neck motion and normal lower extremity findings. R. 658. A physical exam on October 23 found normal inspection and range of motion for upper and lower extremities. R. 704–706 (noting patient complained of lower back and right knee pain). Discharge notes for five of these visits list plaintiff as driving herself home, R. 635, 654, 660, 694, 707, and the fifth indicated a friend was driving, R. 648; *see* R. 699 (noting family driving after August 28, 2015 visit).

On June 5, 2016, plaintiff drove herself to the emergency room, after reportedly slipping on steps and twisting her back the day before. R. 709 (complaining of back and left ankle pain),

711.  A physical exam revealed mild swelling and slight tenderness on the left ankle and paraspinal tenderness on the lower back, with otherwise normal findings, normal strength, and range of motion for the neck, back, and upper and lower extremities.  R. 710.  After an x-ray showed no fracture or dislocation, R. 714, plaintiff's ankle was placed in a splint, she was prescribed crutches and Norco, and she was discharged to drive herself home.  R. 711–13.

### 3.  Medical Source Statement

On October 20, 2016, Dr. Mark Clark of Community First Clinic completed a medical source statement.  R. 715–16.  He reported plaintiff's diagnoses as lumbar radiculopathy, morbid obesity, hypertension, asthma, hyperlipidemia, and an "old myocardial infarction" and assigned her a "fair" prognosis.  R. 715 (noting that her "cardiac condition" does not limit her ability to work).  Dr. Clark reported plaintiff could walk less than one block before experiencing low back and leg pain.  *Id.*  He advised it was "unknown" how long she could continuously stand without pain but that "she cannot stand for long."  *Id.*   He advised plaintiff could rarely lift and carry less than ten pounds and that she could stand/walk for about two hours, and could sit at least six hours, without breaks during an eight-hour workday.  R. 716.  He estimated that plaintiff would need four unscheduled breaks per workday, but apparently not due to any cardiac problems.  *Id.*  Finally, although noting plaintiff was not a malingerer, Dr. Clark indicated that plaintiff failed to follow recommendations to lose weight and pursue physical therapy.  *Id.*

### C.  Hearing Testimony of Vocational Expert Edith Edwards

At the hearing before the ALJ, vocational expert ("VE") Edith Edwards also testified.  R. 49–51.  VE Edwards reviewed plaintiff's work history and characterized her two most recent positions as:   (1) a food service worker/laundry worker, described in the Dictionary of Occupational Titles ("DOT"), as medium, unskilled work; and (2) a medical clerk (described by

plaintiff as a patient service representative), involving sedentary, semi-skilled work at the specific vocational preparation (SVP) 4 level. R. 49–50. In response to the ALJ's hypothetical questions concerning the availability of jobs for a person of plaintiff's age, education, and past work experience, who could perform only sedentary work not requiring more than two hours of standing or walking in an eight-hour work day, who could perform no more than occasional postural activities without climbing or exposure to heights or other environmental hazards, VE Edwards confirmed that such a profile would support work as a patient service representative/medical clerk "consistent with the DOT and the [selected characteristics of occupations] for that job." R. 50; *see* R. 51 (repeating that her testimony was "consistent with information contained in the DOT"). If that hypothetical person frequently needed to lie down during the work day due to back, neck, and knee problems, VE Edwards said no work would be available. R. 50–51. VE Edwards also opined that, if such person need to regularly take unscheduled breaks of unknown duration, there would also be no work available. R. 51.

### III.  THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[7] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). Specifically, the ALJ considered whether plaintiff: (1) was

---

[7] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a); *accord* 42 U.S.C. §§ 423(d)(1)(A), 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. §§ 404.1505(a), 416.905(a). A claimant seeking SSI due to a disabling condition must also establish financial need, among other requirements. *See* 42 U.S.C. § 1383.

engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment.  R. 17–24.

The ALJ found that plaintiff met the insured requirements[8] of the Social Security Act through December 31, 2018, and she had not engaged in substantial gainful activity since June 24, 2013, her alleged onset date of disability.  R. 18.

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) back disorder; (b) neck disorder; (c) bilateral knee osteoarthritis; (d) obesity; (e) hypertension; (f) asthma; and (g) osteoarthritis of the bilateral hips.  R. 19.  The ALJ classified any additional impairments as non-severe, because they responded to medication or required no significant medical treatment, failed to continuously exist for twelve months, or did not otherwise continuously impose functional limitations.  *Id.*  The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three.  *Id.*

The ALJ next found that plaintiff possessed the RFC to perform sedentary work, *see* 20 C.F.R. §§ 404.1567(a), 416.967(a), subject to the limitations that she:  (a) "stand and/or walk for no more than 2 hours in an 8-hour workday"; (b) be limited to "no more than occasional postural movements"; (c) "avoid exposure to excessive environmental conditions"; and (d) engage in "no

---

[8] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act.  *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

climbing . . . or exposure to heights or hazards." R. 20.  Based upon this RFC assessment, the ALJ determined at step four that plaintiff could return to her past relevant work as a patient service representative or medical clerk.  R. 23–24.  Accordingly, the ALJ found that plaintiff was not disabled from June 24, 2013 through the date of the ALJ's decision and was ineligible for a period of disability, DIB, or SSI benefits.  R. 24.

## IV.  <u>STANDARD OF REVIEW</u>

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Craig*, 76 F.3d at 589 (citing *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was

reached by means of an improper standard or misapplication of the law.  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)).  Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law.  *Coffman,* 829 F.2d at 517.

## V. <u>ANALYSIS</u>

### A.  Plaintiff forfeited her constitutional challenge to the appointment of the ALJ.

Plaintiff's motion for summary judgment begins by challenging the ALJ's authority to adjudicate her claim.  Relying upon the Supreme Court's decision in *Lucia v. SEC*, 138 S. Ct. 2044 (2018), plaintiff contends that the ALJ, as an "inferior officer" subject to the Appointments Clause of the Constitution rather than merely an employee, was required to be appointed by the Commissioner of Social Security.  Pl.'s Mem. in Supp. of Mot. for Summ. J. (Pl.'s Mem.) 6–9, ECF No. 32.  Because ALJ Pianin allegedly held no such appointment at the time he rejected plaintiff's disability claim, First Am. Compl. ("Compl."), ECF No. 26 at ¶ 10, plaintiff argues the decision was void and remand is required.  Pl.'s Mem. at 9, 27.

Without addressing the ALJ's status as either an "inferior officer" or employee, the Commissioner argues that plaintiff forfeited any Appointments Clause claim by failing to raise it during the administrative process.  Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") 14, 15 n.4, ECF No. 37.  This failure, the Commissioner contends, precludes plaintiff's untimely assertion of such a claim in federal court.  *Id*. at 14.

1.      **A constitutional challenge premised on the Appointments Clause is nonjurisdictional.**

The Appointments Clause of the Constitution specifies:

[The President] . . . shall nominate and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the Supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or the in the Heads of Departments.

U.S. Const., art. II, § 2, cl. 2.  Section 902(a)(1) of title 42, United States Code, provides for the appointment of a Commissioner of Social Security by the President, with the advice and consent of the Senate.  42 U.S.C. § 902(a)(1); *see* 42 U.S.C. § 901(a) (creating an independent, executive branch agency, the Social Security Administration).  Section 902(a)(7) of title 42, United States Code, authorizes the Commissioner to assign duties and delegate authority to render decisions to such officers and employees deemed necessary.  42 U.S.C. § 902(a)(7).  Section 3105 of title 5, United States Code, authorizes agencies, such as the SSA, to appoint as many administrative law judges "as are necessary for" holding hearings in accordance with the Administrative Procedure Act, 5 U.S.C. §§ 551–59, 701–06, 1305, 3105, 3344, 5372, 7521.  5 U.S.C. § 3105.

Section 405(g) of title 42, United States Code, authorizes judicial review of any final decision of the Commissioner of Social Security in federal district courts.  42 U.S.C. § 405(g).  After an ALJ issues a decision, a disability claimant must decide whether to seek review from the Appeals Council.  *See* 20 C.F.R. §§ 404.900(a)(4), 416.1400(a)(4).  If a claimant foregoes such review, no final decision exists for purpose of judicial review, as the claimant failed to exhaust administrative remedies.  *See id.* at §§ 404.900(b), 416.1400(b); *Bowen v. City of New York*, 476 U.S. 467, 482–83 (1986).  If, as in this case, a claimant requests and the Appeals Council denies review, the ALJ's decision becomes the final decision of the Commissioner and judicial review

21

may be sought.   *See* 20 C.F.R. §§ 404.900(a)(5), 404.955(b), 404.981, 416.1400(a)(5), 416.1455(b), 416.1481, 422.210(a).

Plaintiff's assertion that an alleged defect in ALJ Pianin's appointment renders his decision void necessarily raises concerns about the SSA and the Court's authority to address her case.   The Court must determine, therefore, whether plaintiff's challenge is jurisdictional or nonjurisdictional.   This classification is important because it impacts analysis of the Commissioner's claim that plaintiff forfeited her challenge to any defect in the ALJ's appointment.

A jurisdictional challenge is one that cannot be waived or forfeited.   *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513–14 (2006) (addressing whether Title VII's employee-numerosity requirement was jurisdictional or merely an element of a claim for relief).   Thus, even if the parties consent or a litigant has otherwise forfeited such an argument below, "courts . . . have an independent obligation" to address jurisdictional challenges.   *Id.* at 514; *see* Fed. R. Civ. P. 12(h)(3) (specifying that challenges to a court's subject-matter jurisdiction may be considered "at any time").

A nonjurisdictional challenge, on the other hand, is subject to waiver or forfeiture.[9]   A litigant who fails to timely assert a nonjurisdictional claim when her case was initially adjudicated may lose the opportunity to pursue such a claim at a later phase of the case.   *See Arbaugh*, 546 U.S. at 510–11 (noting that, if the employer's contention was nonjurisdictional, "then its failure to speak to the issue prior to the conclusion of the trial . . . would preclude vacation" of the judgment in plaintiff's favor").

---

[9] Although often used interchangeably, in *United States v. Olano*, 507 U.S. 725, 733 (1993), the Supreme Court characterized forfeiture as the "failure to make the timely assertion of a right, whereas waiver is the intentional relinquishment or abandonment of a known right."  (citation and internal quotation marks omitted).

22

It is undisputed that plaintiff failed to challenge the propriety of the ALJ's appointment before the SSA.  *See* R. 31–33 (opening statement by attorney at ALJ hearing), 134–36 (requesting ALJ hearing and listing attorney representative), 174–75 (filing for Appeals Council review, signed by plaintiff and attorney, asserting only that "[t]he ALJ's decision is not supported by substantial evidence").  Plaintiff first raised the issue only after seeking judicial review, when she sought leave to amend her complaint on September 25, 2018.  ECF No. 20-1 at 2–3.  If plaintiff's challenge is jurisdictional, then her failure to present it to the SSA is of no moment.  Under similar circumstances, however, the Supreme Court, as well as several appellate courts, have classified such challenges as "nonjurisdictional."

For example, in *Freytag v. Comm'r*, 501 U.S. 868, 871–72 (1991), the Supreme Court considered an Appointments Clause challenge to the appointment of a Special Trial Judge, whose proposed findings and opinion were later adopted by the Chief Judge of the Tax Court.  After previously consenting in Tax Court to the Special Trial Judge's assignment to their case, the taxpayers who lost below challenged his appointment for the first time on appeal.  *Freytag*, 501 U.S. at 871–72.  In addressing the matter, the Supreme Court acknowledged that "[t]he alleged defect in the appointment . . . goes to the validity of the Tax Court proceeding that is the basis for this litigation."  *Id.* at 879.  Nevertheless, the Court declined to characterize the challenge as jurisdictional and as one that it was compelled to address.  *Id.*  Instead, after noting instances in which the Court "exercised its discretion to consider nonjurisdictional claims that had not been raised below" and discussing how in *Glidden Co. v. Zdanok*, 370 U.S. 530, 535–36 (1962), it "included Appointments Clause objections to judicial officers in the category of nonjurisdictional structural constitutional objections," the Court elected to consider the taxpayers' challenge.  *Id.* at 878–79 (stating "this is one of those rare cases in which *we should exercise our discretion* to hear

petitioners' challenge to the constitutional authority of the Special Trial Judge") (emphasis added); *see id.* at 893–94 (noting that "Appointments Clause claims, and other structural constitutional claims have no special entitlement to review [and a] party waives the right to advance on appeal a nonjurisdictional claim, structural or otherwise, that he fails to raise at trial") (Scalia, J., concurring in part and concurring in the judgment).

The Courts of the Appeals for the Sixth, Eighth, Ninth, Federal, and District of Columbia Circuits have similarly classified or treated Appointments Clause challenges as nonjurisdictional. *See Kabani & Co., Inc. v. SEC*, 733 F. App'x 918, 919 (9th Cir. 2018) (declining to address "forfeited" Appointments Clause challenge not raised before the SEC or in petitioner's briefs); *N.L.R.B. v. RELCO Locomotives, Inc.*, 734 F.3d 764, 795 (8th Cir. 2013) (declining "to depart from *Freytag's* general rule that [A]ppointments [C]lause challenges are nonjurisdictional"); *GGNSC Springfield v. N.L.R.B.*, 721 F.3d 403, 405–07 (6th Cir. 2013) (holding errors regarding appointment of officers are nonjurisdictional); *Intercollegiate Broad. Sys. v. Copyright Royalty Bd.*, 574 F.3d 748, 756 (D.C. Cir. 2009) (same) (*per curiam*); *In re DBC*, 545 F.3d 1373, 1377, 1380 (Fed. Cir. 2008) (finding such a challenge waived and declining to exercise discretion to consider); *but see N.L.R.B. v. New Vista Nursing and Rehab.*, 719 F.3d 203, 210–13 (3d Cir. 2013) (holding "that the [National Labor Relations Act]'s *three member-composition requirement* is jurisdictional").  In light of this caselaw, and as concluded by numerous other courts considering Appointments Clause challenges to decisions rendered by SSA ALJs, *see, e.g., Faulkner v. Comm'r of Soc. Sec.*, No. 1:17-cv-01197-STA-egb, 2018 WL 6059403, *2 (W.D. Tenn. Nov. 19, 2018), the Court concludes that plaintiff's challenge to the alleged defect in the ALJ's appointment does not implicate the Court's subject-matter jurisdiction and is nonjurisdictional.

2.    **Plaintiff's claim that the SSA lacked jurisdiction to address her case was also forfeited and is without merit.**

Similarly, plaintiff's argument that the ALJ's decision was void and that the SSA lacked authority to adjudicate her case has been forfeited.  Pl.'s Mem. 6, 9.  In *United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33 (1952), the Supreme Court considered and rejected a like challenge.  The case involved a challenge to a decision, adopted by the Interstate Commerce Commission ("ICC"), made by an examiner whose appointment allegedly failed to comply with the Administrative Procedure Act.  *L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 34–35.  Like plaintiff, the party challenging the ICC's decision asserted, for the first time upon seeking judicial review, that the appointment defect rendered the ICC's "action . . . invalid for want of jurisdiction . . . ."  *Id.*  After a three-judge district court panel agreed and invalidated the ICC decision without addressing the merits, the Supreme Court reversed and ruled that the lower court "erroneously entertained" the untimely objection.  *Id.* at 35.  In the absence of a timely objection, the Supreme Court ruled that "the defect in the examiner's appointment . . . is not one which deprives the [ICC] of power or jurisdiction . . . ."  *Id.* at 38; *see Freytag*, 501 U.S. at 898 (noting that the defective appointment challenge to the Special Trial Judge did not call into question the subject-matter jurisdiction of the Tax Court) (Scalia, J., concurring in part and concurring in the judgment).  As plaintiff offers no basis for reaching a contrary conclusion, and because plaintiff's claim for disability benefits otherwise appears to have been properly before and proceeded to a final decision before the SSA, the Court rejects the suggestion that the decision below is void for want of jurisdiction.

Accordingly, because plaintiff's claim is nonjurisdictional and she forfeited the claim that the ALJ lacked authority to address it, the Court next considers whether grounds exist to excuse plaintiff's forfeiture.

### 3.    A challenge to the appointment of an agency officer who adjudicated one's case generally must first be presented to the agency involved.

Plaintiff relies on the Supreme Court's decision in *Lucia* in pressing her Appointments Clause challenge.  *Lucia* involved an administrative enforcement proceeding brought by the SEC alleging civil violations of federal securities laws.  138 S. Ct. at 2049–50.  The SEC assigned an ALJ to conduct the proceeding who had been appointed by SEC staff members, rather than the Commission itself.  *Id.* at 2049–51.  After the ALJ issued a decision and imposed sanctions, including a lifetime ban from the investment industry, the sanctioned party (Lucia) appealed to the Commission, which rejected the claim that the proceeding was invalid because the ALJ "had not been constitutionally appointed."  *Id.* at 2050.  After reviewing the "continuing" nature of the ALJ's position and the "significant" discretionary authority he wielded pursuant to law in adversarial proceedings, the Supreme Court deemed him to be an "officer" subject to the Appointments Clause, rather than a "non-officer employee."  *Id.* at 2051–55.  Because Lucia made a "timely challenge"[10] to the ALJ's appointment both before the Commission and when seeking judicial review, the Supreme Court ruled that Lucia was entitled to a new hearing before a properly appointed ALJ or the Commission itself.  *Id.* at 2055 (citation and internal quotation marks omitted).

---

[10] Plaintiff suggests that the Supreme Court, in characterizing the challenge as "timely" because it was raised before the Commission, necessarily relied upon a regulation addressing the scope of Commission review of decisions by hearing officers.  Pl.'s Mem. 11; Pl.'s Reply Br. 7.; *see* 17 C.F.R. § 201.411.  But *Lucia* nowhere cited or discussed the regulation in question in identifying the challenge as timely.  Also, the pertinent subsection, § 201.411(d), indicates:  (a) merely that exceptions to a hearing officer's decision not addressed in a petitioner's brief "may, at the discretion of the Commission be deemed . . . waived"; and (b) that the Commission may consider other matters not raised, if material, and after proper notice and giving the parties an opportunity to respond.  17 C.F.R. § 201.411(d).  Although not cited by plaintiff or discussed in *Lucia*, section 78y(c)(1), of Title 15, United States Code, provides that "[n]o objection to an order . . . of the Commission, for which review is sought . . . , may be considered by the court unless it was urged before the Commission or there was reasonable ground for failure to do so."

Although acknowledging that *Lucia* did not address the constitutional status of ALJs presiding over non-adversarial hearings and appointed pursuant to 5 U.S.C. § 3105, Pl.'s Mem. 9, plaintiff seeks to avail herself of the same remedy.  But she stands in different shoes than Lucia because she failed to timely challenge the ALJ's appointment before the SSA, notwithstanding that she was represented by counsel. R. 6–7, 31–33, 116–19, 134–36, 174–75.  As a result, plaintiff must surmount the "general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."  *L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 37; *see Woodford v. Ngo*, 548 U.S. 81, 89 (2006) (same).  This rule of administrative procedure serves to provide agencies with an opportunity to correct mistakes before having to answer for them in court, discourages disregard of agency rules, and promotes judicial efficiency and the resolution of claims before agencies.  *Woodford*, 548 U.S. at 89; *see L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 36–37 (noting that the Court's decisions and congressional enactments recognize "that orderly procedure and good administration require that objections to the proceedings of an . . . agency be made while it has opportunity for correction in order to raise issues reviewable by courts"); *Freytag*, 501 U.S. at 895 (noting that judicial "'review' presupposes that a litigant's arguments have been raised and considered in the tribunal of first instance") (Scalia, J., concurring in part and concurring in the judgment).

To avoid the application of this rule, plaintiff argues as follows.  First, she contends that no statute or regulation requires her to exhaust issues for judicial review by first presenting them to the SSA.  Pl.'s Mem. 11–12.

Second, absent such a statute or regulation, she argues that the Court should decline to judicially require issue exhaustion.  *Id.* at 12–13.  Plaintiff contends the Court should follow the

rationale of *Sims v. Apfel*, 530 U.S. 103 (2000), which held that a disability claimant who exhausted administrative remedies before the SSA need not separately present each appellate issue to the Appeals Council before seeking judicial review of such issues.  The Court ruled that it would be "inappropriate" to require issue exhaustion before the Appeals Council as a predicate for judicial review, given the informal, nonadversarial nature of SSA proceedings, the Appeals Council's usual, plenary-type review, and the limited space on the form for requesting such review.  *Sims*, 530 U.S. at 110–12.  Plaintiff further argues that Fourth Circuit precedent nowhere establishes a requirement of issue exhaustion in disability claim appeals.  Pl.'s Mem. 14–15.

Finally, plaintiff argues that, even if issue exhaustion otherwise applied, the Court should excuse it pursuant to exceptions authorizing judicial review of a constitutional claim, as well as a claim whose presentation to an administrative agency would have been futile.[11]  *Id.* at 16–19.  The Court addresses each of these contentions below.

### a. Although SSA's statutes and regulations do not require issue exhaustion, the regulations specify procedures for objecting to an ALJ and raising constitutional issues.

In opposing the Commissioner's claim of forfeiture, plaintiff suggests that the Court's analysis should follow the path taken by the Supreme Court in *Sims v. Apfel*, 530 U.S. 103 (2000).  In *Sims*, the Court first examined whether any statute or regulation adopted by the SSA required issue exhaustion.  *Sims*, 530 U.S. at 107–08.  After noting "that the requirements of administrative issue exhaustion are largely creatures of statute," the Court observed that "the Commissioner does not contend that any statute requires issues exhaustion" and that "SSA regulations do not require issue exhaustion."  *Id.*  Although this still appears to be the case and the Commissioner does not

---

[11] Notably, in seeking to excuse presentation of her claim to the agency, plaintiff nowhere contends that ALJ Pianin was otherwise unqualified to address the substance of her disability claim.

argue otherwise, significant differences exist between this case and *Sims*.  As discussed further below, these differences include both the fact that plaintiff seeks to present an as-applied constitutional challenge that the agency could have addressed, as well as the differing regulatory landscapes applicable to the challenges raised by plaintiff and Sims.  *See* Def.'s Mem. 19.

Following a denial of a claim for disability, a claimant may request a hearing before an ALJ.  20 C.F.R. §§ 404.929, 404.930, 416.1429, 416.1430.  When requesting such a hearing, a claimant must state the reasons she disagrees with the prior determination.   20 C.F.R. §§ 404.933(a)(2), 416.1433(a)(3).  Plaintiff, apparently with her attorney's assistance, did so in this case.  R. 134–36.  On October 12, 2016, the ALJ notified plaintiff and her attorney that her case was scheduled for a hearing on December 12, 2016 and identified the issues to be considered.  R. 149–54; *see* 20 C.F.R. §§ 404.938(b)(1) (indicating that a hearing notice must list the issues to be addressed), 416.1438(b)(1) (same).

Social Security regulations also permit a claimant to object to an ALJ's identification of the issues to be addressed.  20 C.F.R. §§ 404.939, 416.1439.  Upon receiving any such objections, the ALJ must address them either in writing before the hearing or at the hearing itself.  *Id.*; *cf.* 20 C.F.R. §§ 404.946(b)(1) (also authorizing an ALJ to consider later identified "new issue[s]," upon notice, prior to mailing notice of the hearing decision), 416.1446(b) (same).  Here, the record contains no evidence that plaintiff objected and identified ALJ Pianin's appointment as an issue and plaintiff makes no claim that she did so.

Social Security regulations also permit a claimant to object to the ALJ assigned to hear her case.  20 C.F.R. §§ 404.940 (noting that the ALJ "shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision"), 416.1440 (same); *see* 20 C.F.R. §§ 404.929 (authorizing a "the Deputy Commissioner,

or his or her delegate," to assign a case to another ALJ "[i]f circumstances warrant"), 416.1429 (same). Upon receipt of such an objection, the ALJ must decide to proceed with the hearing or withdraw. 20 C.F.R. §§404.940, 416.1440. If the ALJ does not withdraw, the regulations authorize a claimant to "present [her] objections to the Appeals Council as reasons why the hearing decision should be revised or a new hearing held before another administrative law judge." *Id.*[12]

Again, the record contains no evidence that plaintiff filed a contemporaneous objection to ALJ Pianin's appointment and plaintiff nowhere claims otherwise. Nor can plaintiff credibly contend that the legal basis for asserting an Appointments Clause challenge was unknown prior to the Supreme Court's June 21, 2018 decision in *Lucia*. Leaving aside the merits of whether an SSA ALJ is subject to the Appointments Clause, the caselaw noted above generally reflects that such challenges are hardly novel. In fact, months before plaintiff's hearing before the ALJ, a panel of the Court of Appeals for the D.C. Circuit initially rejected Lucia's constitutional challenge on August 9, 2016. *See Lucia v. SEC*, 832 F.3d 277 (D.C. Cir. 2016); *see, e.g., Page v. Comm'r*, No. 17-13716, 2018 WL 5668850, at *3 (E.D. Mich. Oct. 31, 2018) (rejecting disability plaintiff's claimed ignorance "of the constitutional inadequacy of the presiding ALJ," and noting how another party in *Jones Brothers, Inc. v. Sec'y of Labor*, 898 F.3d 669 (6th Cir. 2018) identified "a 'circuit

---

[12] Finally, Social Security regulations authorize a claimant to pursue an expedited appeals process with respect to certain constitutional challenges. Subject to the satisfaction of certain other prerequisites and completion of all but Appeals Council review in the administrative process, a claimant may seek judicial review if a "[claimant] claim[s] and [SSA] agree[s] that the only factor preventing a favorable determination or decision is a provision in the law" alleged to be unconstitutional. 20 C.F.R. §§ 404.924(d), 416.1424(d); *see* 20 C.F.R. §§ 404.923, 416.1423. These regulations indicate, at a minimum, that constitutional issues may be identified before the SSA. Further, although permitting a claimant to short-circuit the final step of administrative review to seek judicial review of a facial constitutional challenge, they do not address as-applied constitutional challenges.

split' on the issue of the appointment of ALJs while its case was still at the administrative level," well before the Supreme Court decided *Lucia*).

Thus, the regulatory backdrop applicable to plaintiff's constitutional challenge differs in important ways from that addressed in *Sims*. Although *Sims* relied in part on the informal and nonadversarial nature of administrative review before the SSA, the Court carefully scrutinized the regulatory and administrative process for requesting Appeals Council review of an ALJ decision. *Sims*, 530 U.S. at 109–12. For example, it noted that Appeals Council review is "plenary," unless otherwise stated, *see* 20 C.F.R. § 404.967(a), and involves evaluation of the "entire record," *see* 20 C.F.R. § 404.970(b). *Id.* at 111. The Court also noted that claimants are notified that, should they seek Appeals Council review (or should the Appeals Council independently pursue the same), the Council will review the entirety of the ALJ's decision. *Id.* Lastly, the Court observed that a form used in requesting Appeals Council review contained "only three lines for the request for review . . . strongly suggest[ing] that the Council does not depend much, if it all, on claimants to identify issues for review." *Id.* at 111–12. Against this regulatory backdrop, the Commissioner's insistence in *Sims* that claimants specify each challenge to the ALJ's disability determination to the Appeals Council or lose them upon judicial review was unpersuasive.

Unlike in *Sims*, where the claimant at least notified the SSA she disagreed with the substance of the ALJ's disability finding in the context of a regulatory scheme requiring little more, plaintiff and her attorneys gave no notice of any challenge to the ALJ's appointment. This failure occurred in the context of a regulatory scheme that, among other things, explicitly provided several opportunities for asserting such a claim. [13] Given that such a claim raises concerns about an ALJ's

---

[13] In her concurrence in the plurality opinion in part II-B of the *Sims* opinion¸ Justice O'Connor separately wrote that "the agency's failure to notify claimants of an issue exhaustion requirement in this context is a sufficient basis for our decision." *Sims*, 530 U.S. at 113. Plaintiff makes no

authority to address plaintiff's case and should have been promptly presented, the regulatory equities weighing in Sims' favor are absent here and counsel against allowing plaintiff to assert such a claim after the fact. Notwithstanding the absence of a statute or rule addressing issue exhaustion, to decide otherwise would likely invite gamesmanship inimical to fair and efficient claim adjudication and compliance with agency procedures. *See Freytag*, 501 U.S. at 895 (permitting a party to raise issues for the first time on appeal "is to encourage the practice of 'sandbagging': suggesting or permitting, for strategic reasons, that the trial court pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error") (Scalia, J., concurring in part and concurring in the judgment).

### b. Judicial adherence to an exhaustion requirement is appropriate in the context of this case.

The Court must next decide whether to fall back upon and apply the court-made rule that issues not presented to an administrative agency generally cannot be argued for the first time when seeking judicial review. Relying upon *Sims* and its discussion of how the informal, nonadversarial nature of SSA claims adjudication made it inappropriate to require exhaustion of issues before the Appeals Council, plaintiff argues that it is likewise inappropriate to require exhaustion of her constitutional challenge to the ALJ's appointment. *Sims*, however, did not categorically hold that court-imposed exhaustion requirements are inappropriate in all social security cases. *Cf. In re DBC*, 545 F.3d at 1380 (noting that, in considering Appointments Clause challenges, the Supreme Court "has proceeded on a case-by-case basis, determining whether the circumstances of the particular case warrant excusing the failure to timely object"). Instead, and as discussed above,

---

claim or argument that SSA's regulations misled her or otherwise caused her to believe she could wait to assert a constitutional challenge to the ALJ's appointment after completing administrative review.

the Court declined to impose such a requirement in view of the highly informal, appellate process established by the SSA for requesting Appeals Council review.

In doing so, the Court also expressly noted that "[w]hether a claimant must exhaust issues before the ALJ is not before us." *Sims*, 530 U.S. at 107; *see id.* at 530 U.S. at 117 (stating that "I assume the plurality would not forgive the requirement that a party ordinarily must raise all relevant issues before the ALJ") (citation omitted) (Breyer, J., dissenting). Other cases, however, have addressed that question. As recently noted by this Court:

> Since *Sims*, numerous federal courts have reaffirmed the vitality of administrative exhaustion in the Social Security context. *See, e.g., Shaibi v. Berryhill,* 883 F.3d 1102, 1109 (9th Cir. 2017) ("[A]t least when claimants are represented by counsel, they must raise all issues and evidence at the administrative hearings in order to preserve them on appeal") (quoting *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999)); *Maloney v. Comm'r of Soc. Sec.*, 480 F. App'x 804, 810 (6th Cir. 2012) (claimant waived argument not presented to ALJ or Appeals Council); *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003) (holding claimant's failure to raise disability claim based on obesity waived the claim from review on appeal).

*Lee v. Berryhill*, No. 2:18cv214, slip op. at 12–13 (E.D. Va. Dec. 20, 2018) (report and recommendation); *see also Mills v. Apfel,* 244 F.3d 1, 8 (1st Cir. 2001) (declining to extend *Sims* to an applicant's failure "to raise an issue at the ALJ level" and noting that "[t]he impact of a no-waiver approach . . . at the ALJ level . . . could cause havoc, severely undermining the administrative process").

Further, most courts to address the matter have applied the general rule of exhaustion in rejecting untimely constitutional challenges to the appointment of SSA ALJs. *See, e.g., Lee v. Berryhill*, slip op. at *13–14; *Abbington v. Berryhill*, No. 1:17-00552-N, 2018 WL 6571208, at *6–9 (S.D. Ala. Dec. 13, 2018); *Pearson v. Berryhill*, No. 17-4031-SAC, 2018 WL 6436092, at *4 (D. Kan. Dec. 7, 2018); *Willis v. Comm'r of Soc. Sec.*, No. 1:18-cv-158, 2018 WL 6381066, at *3 (S.D. Ohio Dec. 6, 2018); *Faulkner*, 2018 WL 6059403, at *3; *Flack v. Comm'r of Soc. Sec.*,

No. 2:18-cv-501, 2018 WL 6011147, at *3 (S.D. Ohio Nov. 16, 2018); *Page*, 2018 WL 5668850, at *3; *Garrison v. Berryhill*, No. 1:17-cv-00302-FDW, 2018 WL 4924554, at *2 (W.D.N.C. Oct. 10, 2018); *Williams v. Berryhill*, No. 2:17-cv-87-KS-MTP, 2018 WL 4677785, at *2–3 (S.D. Miss. Sept. 28, 2018); *Stearns v. Berryhill*, No. C17-2031-LTS, 2018 WL 4380984, at *5–6 (N.D. Iowa Sept. 14, 2018); *Trejo v. Berryhill*, No. EDCV 17-0879-JPR, 2018 WL 3602380, at *3 n.3 (C.D. Cal. July 25, 2018).[14]

The Court agrees with these rulings and agrees that the rationale animating *Sims* does not apply to this case.  As argued by the Commissioner, Def.'s Mem. 19–20, and as discussed in *Lee*, the "[e]fficiency interests" served by the rule requiring exhaustion also strongly favor a different result here.  *Lee*, slip op. at 13.  As explained by the Supreme Court, the SSA operates "probably the largest adjudicative agency in the western world," and as a result, "[t]he need for efficiency is self-evident."  *Barnhart v. Thomas*, 540 U.S. 20, 28–29 (2003) (citation omitted).  Remanding untold numbers of previously decided claims where a claimant failed to timely challenge an ALJ's appointment would further burden a system that considers and holds hearings in thousands of disability cases each year.[15]  In light thereof and because SSA took action, prior to plaintiff's

---

[14] In a report and recommendation filed in *Muhammad v. Berryhill*, No. 18-172, ECF No. 25 (E.D. Pa. Nov. 2, 2018) and pending district judge review, a magistrate judge recommended sustaining the claimant's Appointments Clause challenge and remanding the case.  In support of the ruling, the court noted that the challenge "merits consideration even when not raised below because it impacts the validity of the underlying proceeding," the claimant promptly asserted the challenge after *Lucia*, no SSA statute or regulation required that it be raised earlier, and raising the challenge before SSA would have been futile.  *Muhammad*, No. 18-172, ECF No. 25 at 2.  For the reasons stated herein, the undersigned disagrees.

[15] According to the Commissioner, SSA's Annual Performance Reports note that the agency received over 600,000 hearing requests for each fiscal year between 2014 and 2017 and held more than 652,000 hearings during each of these years.  Def.'s Mem. 20 n.8 (citing Social Security Administration, *Annual Performance Report Fiscal Years 2017-2019* at 35).

September 25, 2018 assertion of an Appointments Clause challenge, to cure any alleged deficiency in the appointment of its ALJs,[16] a healthy regard for "[c]onsiderations of practical justice," *see L.A. Tucker Truck Lines, Inc.,* 344 U.S. at 36, also supports enforcement of the exhaustion rule here.[17]

Finally, plaintiff argues that, in the absence of Fourth Circuit precedent addressing "issue exhaustion," this Court should follow the approach taken by another district court in this circuit. In *Hopkins v. Berryhill*, the court relied on *Sims* and rejected the assertion that a claimant "waived his right to challenge the ALJ's failure to include additional restrictions in the RFC assessment because his counsel failed to object to the ALJ's hypothetical questions to the VE or to present alternative hypothetical questions that accounted for the restrictions." *Hopkins v. Berryhill*, No. 1:17-143-BHH-SVH, 2017 WL 6398181, at *20 (D.S.C. Nov. 21, 2017), *report and recommendation adopted*, 2017 WL 6366879 (D.S.C. Dec. 12, 2017).

The Court declines to do so for several reasons. First, *Hopkins* did not involve an Appointments Clause challenge, which could have been identified and presented to either the ALJ or the Appeals Council before a final agency decision. Second, as discussed in *Hopkins,* the

---

[16] An emergency message issued by the SSA indicates that, on July 16, 2018, the Acting Commissioner "ratified the appointment of ALJs and AAJs and approved their appointments as her own in order to address any Appointments Clause questions involving SSA claims." *See* Emergency Message, EM-18003 REV 2, available at ssa.gov/apps10/reference.nsf/links08062018021025PM, last visited January 22, 2019; *see also* ECF No. 24 at 1.

[17] Further, plaintiff's request for remand and a new hearing before another ALJ is arguably a claim predicated on "new evidence" concerning the facts of ALJ Pianin's appointment not presently before the Court. To the extent that section 405(g) of title 42, United States Code, authorizes a remand for taking additional evidence, it requires that a court find the existence of "good cause for the failure to incorporate such evidence into the record" previously. 42 U.S.C. § 405(g). Plaintiff has not established good cause for such a remand.

claimant there testified before the ALJ concerning, and the record contained substantial other evidence about, his mental health impairments that the ALJ failed to adequately consider at steps two and four. *Hopkins*, 2018 WL 639818, at *11, 17–20. By doing so, and unlike plaintiff, the claimant arguably preserved arguments about his mental health impairments and capacity to perform relevant mental functions. Having done so prior to the issuance of the ALJ's decision, his claim for falling within the scope of *Sims*' rationale was stronger than plaintiff's. Third, *Hopkins* in no way addressed waiver in the context of *Lucia's* insistence upon the timely assertion of claims like plaintiff's, challenging the constitutional validity of an officer's appointment.[18] *See Lucia*, 138 S. Ct. at 2055. Accordingly, it is appropriate to require exhaustion in plaintiff's case.

### c. No basis exists to excuse plaintiff's failure to present her as-applied constitutional challenge to the ALJ's appointment to the SSA.

Thus, the Court must next consider plaintiff's reasons for excusing her noncompliance. First, and relying upon *Mathews v. Eldridge*, 424 U.S. 319 (1976), plaintiff contends that exhaustion should not be required for claimants presenting a constitutional claim.

*Eldridge* involved a due process challenge to the constitutionality of administrative procedures that did not provide for a hearing before terminating previously awarded social security disability benefits. *Eldridge,* 424 U.S. at 323. This issue arose because Eldridge filed suit promptly after the SSA gave notice it was terminating his benefits, without seeking reconsideration and full administrative review or raising his constitutional claim to the agency. *Id.* at 324–25, 329.

---

[18] Similarly, the Court is not persuaded by plaintiff's suggestion that the Fourth Circuit's rulings in *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015), and *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986), about an ALJ's duties in exploring all relevant facts, developing and evaluating the evidence, and ensuring proper vocational expert testimony speak to whether a claimant who fails to notify the SSA about her Appointments Clause challenge timely presents it when seeking judicial review. *See* Pl.'s Mem. 15.

Before addressing the merits, the Supreme Court rejected the argument that Eldridge failed to properly invoke federal court jurisdiction, pursuant to 42 U.S.C. § 405(g)'s requirement for obtaining a "final decision" after a "hearing." *Id.* Notwithstanding this, the Supreme Court held that, in initially contesting the state agency's proposed termination of benefits, Eldridge satisfied section 405(g)'s nonwaivable jurisdictional requirement to present a claim for benefits to the agency. *Id.* at 328–29. The Court further determined that, regardless of whether Eldridge exhausted agency review, he need not have presented his constitutional claim to the agency because it was "unrealistic to expect that the Secretary would consider substantial changes in the current administrative review system at the behest of a single aid recipient raising a constitutional challenge in an adjudicatory context." *Id.* at 329 n.10, 330. Based upon Eldridge's colorable claim that his physical condition and dependency upon disability benefits exposed him to harm not subject to recompense after the fact, the Court also found it appropriate to waive the administrative exhaustion requirement. *Id.* at 328 (characterizing exhaustion of administrative remedies as the "waivable" condition of judicial review), 330.

Drawing upon the Court's characterization of "Eldridge's constitutional challenge [as] entirely collateral to his substantive claim of entitlement," *id.*, plaintiff argues that if Eldridge need not have exhausted administrative *remedies* when making a constitutional claim collateral to his benefits claim, "then it necessarily follows that [a claimant] need not exhaust all *issues* that might have arisen in the course of the agency appeal after the point he is not required to exhaust remedies." Pl.'s Mem. 17.

The Court disagrees. Plaintiff's attempt to apply *Eldridge* to excuse her forfeiture sweeps too broadly and ignores subsequent caselaw. Rather than categorically excusing the failure to exhaust a constitutional claim before an administrative agency, after *Eldridge* the Supreme Court

confirmed in *Lucia* that Appointments Clause challenges should, as a matter of course, be timely presented to the agency involved.  *Lucia*, 138 S. Ct. at 2055 (noting that Lucia "contested the validity of . . . [the] appointment before the Commission").   Absent that, the Court also indicated in *Freytag* that judicial discretion should be exercised to excuse forfeiture in only "rare cases." 501 U.S. at 879; *see id.* at 893 (concurring and opining that "Appointments Clause claims, and other structural constitutional claims, have no special entitlement to review").   And, whereas *Eldridge* recited unusual factual circumstances that supported dispensing with the full panoply of agency review, 424 U.S. at 330–31, plaintiff alleges nothing comparable.

Further, although the Supreme Court in *Eldridge* indicated that a constitutional claim of entitlement to a pre-deprivation hearing was better addressed by an Article III court, 424 U.S. at 329–30, it has also indicated that federal employees alleging that a statute providing the basis for their dismissal was unconstitutional, must first present such a claim to the Merit Systems Protection Board ("MSPB"), the agency vested by statute with authority to first consider appeals of employee dismissals, even if that agency "has repeatedly refused to pass upon the constitutionality of legislation."[19]  *Elgin v. Dep't of Treasury*, 567 U.S. 1, 16 (2012); *see also Bennett v. SEC*, 844 F.3d 174, 188 (4th Cir. 2016) (dismissing Appointments Clause challenge to SEC ALJ brought in district court for lack of jurisdiction because Congress "intended to channel

---

[19] In *Elgin*, a federal employee initially appealed his dismissal to the MSPB, as required by statute, but before completing that appeal and seeking review, as required, before the Court of Appeals for the Federal Circuit, he joined a suit in federal district court with others contesting the constitutionality of the Civil Service Reform Act.  567 U.S. at 6–7.  The Supreme Court held that the review procedure established by that Act precluded the exercise of district court jurisdiction. *Id.* at 5, 12–13.  Significantly, in also rejecting an argument to allow the assertion of certain constitutional claims in district court, independent of the comprehensive review scheme provided by the statute, the Court also observed that the task of drawing jurisdictional lines based upon the type of a constitutional claim "is hazy at best and incoherent at worst."  *Id.* at 15.

all objections to such orders—including challenges rooted in the Appointments Clause—through the administrative adjudication and judicial review process set forth in the statute").

Finally, to the extent that plaintiff relies on *Eldridge* to assert that her constitutional claim is collateral to her claim for benefits, *Elgin* indicates otherwise, stating "petitioners' constitutional claims are the vehicle by which they seek to reverse" agency action and are "[f]ar from . . . wholly collateral . . . ." 567 U.S. at 22; *see also Bennett*, 844 F.3d at 187 (relying on *Elgin* to reject argument that constitutional challenge to ALJ's appointment was "wholly collateral" because it "ar[ose] out of the enforcement proceeding").  Based upon the foregoing, and because plaintiff's constitutional challenge is not wholly collateral to her claim for disability benefits, the Court declines to adopt her proposed, expansive reading of *Eldridge* or excuse her failure to present her constitutional claim to the SSA.

### d.      Plaintiff has not shown that it would have been futile to present her claim to the SSA.

Plaintiff also asks the Court to excuse, as futile, her failure to present her constitutional challenge to the ALJ or the Appeals Council. Pl.'s Mem. 18–19.  The ALJ heard and decided her case on December 12, 2016 and January 19, 2017, respectively, and the Appeals Council denied her request for review on October 16, 2017. R. 1, 13, 29.  After these events, the SSA issued now superseded, emergency guidance on January 30 and June 25, 2018, directing that ALJs acknowledge Appointments Clause claims but recite that they lack the authority to address them and directing the Appeals Council not to acknowledge, discuss, or make findings related to such claims. ECF Nos. 32-1 at 2–3, 32-2 at 2–3; *see supra* note 16.  Such guidance, plaintiff argues, is tantamount to a declaration by the Commissioner that presentation during the administrative

process was futile and precludes the Commissioner's insistence upon exhaustion.  Pl.'s Mem. 18–19.[20]

In *Lee v. Berryhill*, this Court considered and persuasively rejected a similar argument for excusing a claimant's forfeiture.  *Lee* ruled that, regardless of whether an individual ALJ possessed the authority to address the sufficiency of his or her appointment, a claimant still was required to present that claim to the agency.  *Lee,* slip op. at 6–7.  The reason for such a requirement is buttressed by the fact that, "[a]s the SSA had already apparently recognized, it retained the ability to cure any *Lucia*-related defect in the appointment of ALJs by having the Commissioner herself (as department head) confirm the appointments."  *Lee*, slip op. at 6 (citing Emergency Message, EM-18003 REV 2 reporting the ratification and approval of ALJ appointments by the Acting Commissioner on July 16, 2018); *cf. Elgin*, 567 U.S. at 23 (noting that the application of agency "expertise" and action "might fully dispose of the case" or "alleviate constitutional concerns").

Further, as argued by the Commissioner, the SSA policy directives upon which plaintiff purports to rely were issued *after* the final agency decision and *after* plaintiff failed to notify the agency about her claim.  Def.'s Mem. 23.  Therefore, they are mostly irrelevant and there can be no claim that plaintiff's awareness of them caused her to forego timely presentation of her claim.  Moreover, even had they existed when the agency addressed plaintiff's claim, such directives

---

[20] The Court agrees with the Commissioner that plaintiff's reliance upon *Bethesda Hospital Ass'n v. Bowen*, 485 U.S. 399 (1988) fails to advance her futility argument.  *See* Def.'s Mem. 22–23. Unlike plaintiff, the Bethesda Hospital entities, who were challenging a Medicare reimbursement regulation, presented their challenge to the agency whose determination triggered the right to seek judicial review.  485 U.S. at 404–07.  Having done so, the Supreme Court excused as "unnecessary" the prior presentation of the challenge to a fiscal intermediary (below the agency) lacking "power to award reimbursement except as the regulations provide."  *Id.* at 404, 407.  In so ruling, the Court never indicated that the entities challenging the regulation could forego all phases of administrative review.  To the contrary, the Court noted that "[t]he [agency] has a role in shaping the controversy that is subject to judicial review," even though it lacked "the authority to declare regulations invalid."  *Id.* at 406–07.

would not support excusing her forfeiture.  *See L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 37 (declining to excuse a failure to object and noting that, in spite of a "predetermined policy" by the ICC to overrule appointment objections, the agency retained an ability to fix the problem and requiring agency presentation "might lead to a change in policy, or, . . . would at least . . . [provide] notice of the accumulating risk of wholesale reversals"); *see Lee*, slip op. at 7–8 ("the rationale of *L.A. Tucker Truck Lines* applies with equal force here").

Also, as discussed in *Lee*, the non-jurisdictional, as-applied nature of the constitutional claim at issue "required [a claimant] to present it administratively or risk waiver." *Id.* at 8–9 (citing and discussing *Jones Bros v. Sec'y of Labor,* 898 F.3d 669 (6th Cir. 2018)).  After reviewing how the Sixth Circuit in *Jones Brothers* distinguished between constitutional claims stemming from errors agencies are empowered to correct and claims directed at the validity of a statute, *see* 898 F.3d 673–77, *Lee* observed that "[n]othing in the Social Security Act requires the allegedly unconstitutional process the SSA adopted to appoint hearing officers," and the Commissioner "retains the power to constitutionally appoint ALJs . . . ." *Id.* at 10.  Inasmuch as plaintiff's claim is identical to that asserted in *Lee*, the same reasoning applies here.  Despite the constitutional nature of plaintiff's claim, its presentation to the SSA cannot be classified as a futile endeavor. Therefore, the Court declines to excuse plaintiff's forfeiture on this ground.

Accordingly, plaintiff forfeited her constitutional challenge to the allegedly defective appointment of ALJ Pianin and no basis exists for excusing that forfeiture.  For these reasons, the undersigned recommends that summary judgment be **GRANTED** in the Commissioner's favor on count two of the first amended complaint.[21]

---

[21] Based upon this recommendation, no need exists to consider the merits of whether an SSA ALJ's duties are sufficiently like those of an SEC ALJ to render the former's appointment likewise defective.  Also, to the extent the first amended complaint alleges that "none of the [agency]

**B.**     **Having identified plaintiff's "neck disorder" as a severe impairment, the ALJ committed no error in assessing plaintiff's associated hand and finger pain.**

Turning to the substance of the disability determination, plaintiff first attacks the ALJ's classification of impairments at step two.  Plaintiff argues that the "ALJ's finding that [her] 'hand/finger' pain is not a severe impairment is not supported by substantial evidence." Pl.'s Mem. 19.  She also argues that, regardless of whether her hand/finger pain qualified as a severe impairment, the ALJ compounded this error by excluding it from the analysis of plaintiff's RFC. Pl.'s Mem. 22.  Because substantial evidence supports the ALJ's classification of plaintiff's "neck disorder" as a severe impairment and he properly considered this disorder and any resulting limitations at step four, the Court rejects these arguments.

At step two of the sequential analysis, a claimant must show she has a "medically determinable physical or mental impairment . . . or combination of impairments" that is severe and has lasted or is expected to last for a continuous period of at least 12 months.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii), 416.909, 416.920(a)(4)(ii); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 (1987) (citing 42 U.S.C. § 423(d)(5)(A), which provides that a claimant "shall not be considered to be under a disability unless [s]he furnishes such medical and other evidence of the existence thereof").  A medically determinable impairment "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).  An impairment cannot be established solely through a claimant's statement of symptoms, but instead must be demonstrated "by medical evidence consisting of signs, symptoms, and laboratory findings."  20 C.F.R.

individuals" who adjudicated plaintiff's case were properly appointed, ECF No. 26 at ¶ 10, and her brief once suggests that her Appointments Clause challenge extends to "acting commissioners . . . [and] Appeals Council members," Pl.'s Mem. 6, plaintiff's forfeiture also extends to such officers.

§§ 404.1508, 416.908; *see also* 42 U.S.C. § 423(d)(5)(A).  If the record establishes the existence

of a medically-determinable impairment, symptoms reasonably expected to result therefrom shall

be considered by an ALJ in assessing the severity of an impairment at step two.  *Botten v. Astrue*,

No. 4:09cv57, 2010 WL 114929, at *6 (Jan. 12, 2010) (citing Social Security Ruling ("SSR") 96–

3p, 1996 WL 374181 (July 2, 1996)).

      An impairment is severe within the meaning of the Social Security regulations if it imposes

significant limitations on the claimant's ability to perform basic work activities.  *See* 20 C.F.R.

§§ 404.1522(a), 416.922(a).  In contrast, an impairment is *not* severe if it "has such a minimal

effect on the individual that it would not be expected to interfere with the individual's ability to

work."  *Evans v. Heckler,* 734 F.2d 1012, 1014 (4th Cir. 1984).

      At step two, the ALJ classified plaintiff's "neck disorder" as a severe impairment.  R. 19.

The ALJ also classified plaintiff's hand/finger pain as a nonsevere impairment.  *Id.*  This latter

classification appears to confuse the concepts of symptoms (such as pain) and impairments.  "Pain

is considered a symptom, not an impairment."  *See Swarrow v. Colvin*, No. 2:13-CV-01060, 2014

WL 3420429, at *11 (W.D. Pa. July 14, 2014) (rejecting as "untenable" the argument that pain

allegedly caused by spinal and leg problems was an impairment); Hearings, Appeals and Litigation

Law Manual ("HALLEX") II-4-1-3, 1994 WL 1630959, at *7 ("pain is  a symptom of an

impairment and not an impairment in itself"); *see also* SSR 96-4p, 1996 WL 374187, at *1 ("A

'symptom' is not a 'medically determinable physical or mental impairment' and no symptom by

itself can establish the existence of such an impairment.").

      Momentarily leaving aside whether the ALJ later discounted any hand/finger pain, plaintiff

appears to understand the above-noted distinction.  As correctly noted in her brief, "cervical

radiculopathy is a single impairment that causes both symptoms," that is, neck and radiating

hand/finger pain.  Pl.'s Mem. 21.  To the extent that the ALJ discussed hand/finger pain resulting

from plaintiff's neck disorder (or cervical radiculopathy) as a separate impairment (albeit

nonsevere), he erred in mistaking a symptom for a separate impairment.

       This error, however, was harmless.  This is so because the ALJ's classification of the "neck

disorder" as a severe impairment fully encompassed plaintiff's cervical radiculopathy, along with

its resulting symptoms.  Just as the ALJ's classification of plaintiff's "back disorder" as a severe

impairment, R. 19, encompassed her treating provider's diagnosis of "lumbar radiculopathy," R.

715, so too did the ALJ's finding of a neck disorder cover plaintiff's cervical radiculopathy.[22]  R.

19, 474; *cf. Burnside v. Colvin*, 197 F. Supp. 3d 705, 719 (M.D. Pa. 2015) (finding no error in the

naming of an impairment, as the outcome turned "on the demonstration of the functional

limitations of the disease or impairment rather than the . . . diagnosis . . . or name").  The medical

evidence of record relating to plaintiff's neck problems, although limited, linked them to her

---

[22] Moreover, the record appears to contain only two references to "cervical radiculopathy."  *See* Pl.'s Mem. 20.  The first is in the notes of a physical therapy assessment of plaintiff on October 1, 2013.  R. 474–78.  On the first page, cervical radiculopathy is included among a listing of diagnoses.  R. 477.  The origin of a such a diagnosis, however, is unclear.  Although one might reasonably infer that the referring physician identified in the therapist's notes made it, Dr. Salvant's treatment notes from September 23, 2013 contain no such diagnosis or reference to cervical radiculopathy.  R. 389–91 (noting lumbar diagnoses, absence of imaging "studies for the neck," plaintiff's complaints of neck pain radiating into her shoulder and some numbness in right hand and fingers, and referral for back and neck therapy).  At the physical therapy assessment, plaintiff declined use of Spurling or compression testing for assessing the presence of cervical radiculopathy, evidenced no sensory impairments in her arms and hands, and exhibited neck range of motion mostly within normal limits, but often with reported pain.  R. 476.  The second reference is associated with a December 5, 2014 x-ray of plaintiff's cervical spine.  R. 614.  This document pertains to the only diagnostic imaging of plaintiff's cervical spine in the record.  The listed "reason for exam" is stated as cervical radiculopathy.  *Id.*  Notably, however, neither the radiologist's report or his diagnostic impressions report any such diagnosis or findings.  *Id.* The listed "impressions" are "degenerative disk changes at C5–6" and "[s]traightening of the normal cervical lordosis which may reflect muscle spasm."  *Id.*  Given these anomalies and the otherwise sparse medical record concerning plaintiff's neck problems, the ALJ's use of the broader classification of a "neck disorder" is well-supported.

reported hand/arm problems, R. 389, 474, 614, 739, and plaintiff acknowledges this connection. Pl.'s Mem. 21 ("cervical radiculopathy is a single impairment that causes both symptoms").  The existence of such a connection here is also supported by the absence of evidence of other impairments potentially causing the hand/finger pain about which plaintiff complained.  Therefore, the ALJ's erroneous categorization of hand/finger pain as an impairment is of no significance.

Plaintiff's related attack upon the ALJ's treatment of her hand/finger pain in determining her RFC, *id.* at 22, is also without merit.  Rather than ignoring the matter, the ALJ carefully reviewed the medical evidence pertaining to plaintiff's hand/finger pain.  In this regard, the ALJ identified and discussed each of the five pieces of medical evidence addressing plaintiff's neck problems, including:  (1) Dr. Salvant's September 23 and November 4, 2013 and April 7, 2016 treatment notes, R. 389–92, 739–42; (2) plaintiff's single visit to the physical therapist on October 1, 2013, R. 474–78; and (3) the December 5, 2014 report for the sole x-ray of plaintiff's cervical spine, R. 614.  R. 21–22.

The ALJ also discussed plaintiff's testimony regarding "neck pain, and bilateral hand/finger pain, stiffness, and numbness radiating into her arms two to three times a week."  R. 21.  Indeed, plaintiff mostly relies upon this self-reporting to argue that the ALJ improperly excluded functional limitations stemming from her neck, arm, and hand conditions in assessing RFC.  *See* Pl.'s Mem. 20; *cf. Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996) (stating that the mere recording of a claimant's subjective complaints in medical records does not transform the complaints into objective medical findings).

The ALJ reviewed the sparse medical evidence of neck problems and plaintiff's testimony about the same in the context of her otherwise substantial record of medical treatment.  In doing so, he found plaintiff's testimony wanting.  The ALJ determined that plaintiff's testimony about

the intensity, persistence, *and limiting effects* of her symptoms was "not entirely consistent with the medical evidence and other evidence in the record . . . ."  R. 21 (emphasis added).  The ALJ noted, for example, plaintiff's "conservative treatment" history, including the absence of surgical intervention, her use of ibuprofen over prescription pain medications, her abandonment of physical therapy, her failure to return to the neurological and spine clinic for two and one-half years after briefly treating there in 2013, and her disregard of Dr. Salvant's treatment recommendations, including to lose weight, take anti-inflammatory medications, and return, if needed, for steroidal injections.  *Id.* at 21–22 (noting that "noncompliance with prescribed treatment supports a finding that her symptoms were not as severe and limiting as she alleged").  Indeed, the medical evidence shows that plaintiff only sought or received treatment for neck problems briefly in the fall of 2013, had a single x-ray in 2014 without any ensuing treatment, and returned for one final visit to the neurological and spine clinic in 2016.

In contrast, the ALJ also reviewed evidence demonstrating that, while regularly seeking treatment for other medical problems, examination of plaintiff's neck, upper extremities, and neurological status failed to reveal evidence of problems corresponding with plaintiff's testimony, such as abnormal examination findings for range of motion, motor strength, grip/arm strength, reflex or sensory deficits or tenderness, focal neurological deficits, and upper extremity problems. R. 21–22; *see* R. 389–90, 578, 580, 602, 646, 653, 658, 705–06, 739, 776–77 (no findings about neck and arm/hand pain and voiced no such complaints).  Further, other than as noted above, when seeking treatment for other medical issues, plaintiff generally voiced no complaints about her neck and related problems in her hands and arms.

The ALJ may have been justified, based on this record, in entirely excluding functional limitations allegedly resulting from plaintiff's neck disorder, but he did not do so.  R. 20.  In spite

46

of noting that her part-time work in 2015 and 2016 "reflect[ed] positively on plaintiff's ability to perform work at the light exertional level," R. 18, consistent with the opinions of the state agency medical consultants, R. 21, the ALJ determined plaintiff could only perform sedentary work based, in part, upon plaintiff's testimony and complaints about pain.  *See* 20 C.F.R. §§ 404.1567(a) (defining "sedentary" work), 416.967(a).  He assessed that plaintiff's impairments and associated symptoms also precluded climbing, limited the hours she could stand or walk, and limited her to "no more than occasional postural movements."  R. 20.  Like plaintiff's treating physician and the state agency physicians, R. 72–73, 80–81, 715–16, the ALJ identified no applicable manipulative limitations that were needed.  The omission of any such limitations was also consistent with the ALJ's notation that, while living on her own and mostly independent of the aid of others, plaintiff retained the abilities to clean, cook, do laundry, wash dishes, and hold stair rails when walking and climbing.  R. 21.

For all these reasons, substantial evidence supports the ALJ's determination of plaintiff's severe impairments, the functional limitations resulting therefrom, and her RFC.

**C.     The ALJ's analysis of the listings at step three, and his consideration of plaintiff's obesity, is supported by substantial evidence.**

Plaintiff next argues that the ALJ erred at step three by failing to account for her morbid obesity in assessing whether she met the requirements of a listing and in failing to articulate reasons that no listing was met.[23]  Plaintiff apparently contends that, under the doctrine of equivalence, the combination of her impairments and obesity satisfy listing 1.02A, dealing with major joint dysfunction, due to her inability to ambulate effectively.  *See* Pl.'s Mem. 23–25.  She also argues

---

[23] The heading to plaintiff's argument also contends that this same error infected the ALJ's assessment of plaintiff's RFC.  Pl.'s Mem. 22.  Because plaintiff fails to argue this point in the body of her brief, the Court deems the argument waived.

that remand is required because the ALJ's alleged failure to explain his reasoning frustrates meaningful judicial review. *Id.* at 25. In response, the Commissioner argues that: (1) plaintiff failed to meet her burden of proving that her impairments satisfy a listing; (2) the ALJ discussed and considered plaintiff's obesity at step three; and (3) plaintiff's evidence supporting her listing argument is insufficient. Def.'s Mem. 30–35.

The Listing of Impairments describes those impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of . . . age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a); *see* 20 C.F.R. pt. 404, Subpt. P, App. 1 (listing impairments, organized by major body systems). If a claimant's impairments meet or medically equal a listing, that alone suffices to establish disability at step three, without need for further analysis. 20 C.F.R. §§ 404.1520(d), 416.920(d). An impairment meets a listing "when it satisfies all of the criteria of that listing, including any relevant criteria in the introduction, and meets the duration requirement." *Id.* at §§ 404.1525(c)(3), 416.925(c)(3). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). If an impairment fails to meet the listing criteria, however, it still may be deemed to satisfy a listing if the impairment medically equals the criteria. 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5). To show medical equivalence, a claimant must present medical findings equal in severity to all the criteria for that listing. *Sullivan,* 493 U.S. at 531; 20 C.F.R. §§ 404.1526(a), 416.926(a).

A claimant bears the burden of establishing impairments meeting or equaling the criteria of a listing. *See Zebley*, 493 U.S. at 530–31; *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995) (noting the claimant bears the burden of proof and production at steps one through four). "[A]n ALJ must fully analyze whether a claimant's impairment meets or equals a 'Listing' where there

is factual support that a listing could be met." *Huntington v. Apfel*, 101 F. Supp. 2d 384, 390 (D. Md. 2000) (citing *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).  Pursuant to *Cook*, however, the predicate to this duty is the existence of "ample evidence in the record to support a determination that the claimant's impairment meets or equals one of the listed impairments . . . ." *Ketcher v. Apfel*, 68 F. Supp. 2d 629, 645 (D. Md. 1999).  To permit meaningful judicial review to occur, the ALJ's ruling must discuss the evidence found credible and why, as well as apply the pertinent legal requirement to the evidence of record.  *Radford v. Colvin*, 734 F.3d 288, 295 (4th Cir. 2013).

Plaintiff complains about the ALJ's assessment of listing 1.02(A), which applies to a "[m]ajor dysfunction of a joint[]."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02(A).  To establish disability thereunder, a claimant must establish:

> [a] gross anatomical deformity (*e.g.*, subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.  Involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id.*  An "inability to ambulate effectively" consists of "an extreme limitation of the ability to walk" and is generally characterized by the presence of "insufficient lower extremity functioning [] to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities."  *Id.* at § 1.00(B)(2)(b)(1); *see Hargrove v. Berryhill*, No. 1:18cv0187 (JFA), 2018 WL 3735586, at *11 (E.D. Va. Aug. 6, 2018) (noting rulings from "this district . . . require that the claimant be required to use assistive devices that limit the use of both upper extremities") (citations omitted).  For example, "ineffective ambulation include[s] . . . the inability to walk without the use of walker, two crutches or two canes, the inability to walk a block

at a reasonable pace on rough and uneven surfaces, . . . the inability to carry out routine ambulatory activities, such as shopping . . . , and the inability to climb a few steps at a reasonable pace with the use of a single hand rail." *Id.* at § 1.00(B)(2)(b)(2). The regulations also provide that being able to walk independently about one's home without using assistive devices is not, by itself, proof of ability to effectively ambulate. *Id.* Finally, the inability to ambulate effectively must exist "on a sustained basis," meaning it has lasted or is expected to last for at least one year. *Id.* at § 1.00(B)(2)(a).

Plaintiff argues that, due to the "combination" of her excessive weight and orthopedic impairments, the ALJ erred in finding that she failed to satisfy the existence of a musculoskeletal impairment due to her inability to ambulate effectively. Pl.'s Mem. 22, 24–25 (focusing upon plaintiff's obesity and knee problems). To support this argument, plaintiff relies upon Social Security Ruling 02-1p. SSR 02-1p, 2002 WL 34686281, at *3–7 (Sept. 12, 2002). That ruling directs that ALJs consider both the individual and cumulative effects of obesity at analytical steps two through five. *Id.* at *1. Although recognizing that no listing for obesity exists, the ruling states that "obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing." *Id.* at *5. The ruling also recognizes that obesity may, by itself, be medically equivalent to a listed impairment when, by way of example, "the obesity is of such a level that it results in an inability to ambulate effectively . . . it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A . . . ."[24] *Id.*

---

[24] Although plaintiff's brief discusses and recognizes this, Pl.'s Mem. 23, she apparently is not making such a claim here. Pl.'s Mem. 1–2 (noting "[t]he combination of arthritis in her knees and

The ALJ decided, in pertinent part, that plaintiff's "severe impairments are not attended, singly or in combination, with the specific clinical signs and diagnostic findings required to meet or equal the requirements set forth in section[] 1.00 Musculoskeletal Systems . . . , giving consideration to the combined effects of obesity, in accordance with [SSR] 02-1p." R. 19.  The ALJ specifically discussed the requirements of SSR 02-1p, relative to steps two through four, and noted generally how obesity "may have an adverse impact upon the medical severity of co-existing impairments" and how it "may limit [one's] ability to sustain activity" regularly and continuously during a typical work day and week.  *Id.* at 19–20.  Taking such considerations into account based upon the facts of this case, including plaintiff's height, weight, and body mass, the ALJ concluded that "even when her excessive weight is considered in conjunction with her remaining impairments, the objective signs and findings do not fulfill the requirements of any medical listing."  *Id.* at 20.

Although the ALJ did not specifically address the requirements of listing 1.02(A), his decision expressly found plaintiff retained the functional ability to walk for two hours in an eight-hour work day and perform sedentary[25] work and, in so deciding, implicitly rejected a finding of inability to ambulate effectively as required by that listing.  *Id.*  Contrary to plaintiff's claim, the ALJ's decision sufficiently articulates its rationale to permit judicial review.

The ALJ fully reviewed plaintiff's allegations about her difficulties with walking in her testimony, her function report, and as noted in medical records when seeking treatment for her

---

obesity prevents her from ambulating effectively and arguably is equivalent in severity to a listed impairment").

[25] The definition of "[s]edentary work" recognizes that "a certain amount of walking and standing is often necessary in carrying out job duties" and distinguishes sedentary from "light work," in part, because the former requires such "occasionally" whereas the latter typically requires "a good deal of walking or standing . . . ."  20 C.F.R. §§ 404.1567(a), (b), 416.967(a), (b).

knees and other conditions.  He discussed, for example, plaintiff's claims that:  (1) pain prevents her from walking, standing, and sitting for very long; (2) weakness and pain sometimes cause her legs to give way and have led to falls; (3) she cannot walk more than 25 feet; (4) she uses walls and rails to brace herself when walking and climbing; (5) she uses a motorized cart when shopping; (6) she receives assistance with various tasks from family; (7) her conditions and lack of sleep cause fatigue; and (8) walking, standing, and sitting exacerbate her knee pain.  *Id.* at 20–23.

In addition to discussing plaintiff's height, weight, body mass, and multiple impairments, the ALJ also addressed plaintiff's "bilateral knee pain" and hip pain.  *Id.* at 23.  The ALJ discussed: (1) the findings of her May 3, 2014 knee x-rays revealing arthritic, degenerative changes in both knees, R. 23, 584–85, 587–88 (noting "ambulating without assistance, driving self" upon discharge); (2) the findings of hip x-rays that revealed mild to moderate osteoarthritis in the S1 joints bilaterally, as well as the absence of significant treatment for hip pain, R. 23, 615; (3) the absence of evidence of lumbar spinal nerve root compression or stenosis in an August 26, 2013 MRI of plaintiff's back, R. 21, 381–82; (4) that, when examined on September 23, 2013, in spite of plaintiff's subjective complaints (including leg pain), she presented with "no signs of motor, reflex, or sensory deficit[s]," R. 21–22, 389–90; (5) how, during a November 4, 2013, follow-up appointment for back and neck pain, plaintiff presented with a "slow, antalgic gait," R. 22, 392; (5) how, on March 20, 2014 when living in a second story apartment, plaintiff sought ER treatment for back pain and, after also complaining about having trouble walking, was "observed to walk without any apparent difficulty," R. 22, 580; (6) that, on July 3, 2014, plaintiff presented with bilateral knee tenderness and swelling and reported that taking Neurontin and Celebrex helped with her knee pain, while not fully resolving it, R. 23, 773–75; (7) how, when treated on September 22, 2015 for back (and knee) pain, plaintiff was directed to take ibuprofen, R. 22, 753–54; and (8)

how, when treated for back and neck pain on April 7, 2016, Dr. Salvant observed normal strength and reflex activity bilaterally, without loss of sensation, but also discomfort with weight bearing on the right knee due to "bad" arthritis and noted plaintiff's refusal of a knee injection and anti-inflammatories, R. 22, 739, 741. Thus, the ALJ reviewed all relevant medical evidence, including that arguably at odds with his final conclusion.

Having reviewed plaintiff's statements and testimony, as well as the medical record, the ALJ found the record of plaintiff's treatment for knee pain to be both "infrequent" and "conservative." R. 23. The former finding is, of course, inconsistent with the requirement that an inability to ambulate exist on a sustained basis for one year. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(a). The ALJ also noted that, instead of needing surgery, plaintiff was directed "to lose weight in order to improve joint mobility" and to take non-narcotic painkillers, such as ibuprofen, and anti-inflammatories. R. 23. Such treatment directives, which notably nowhere prescribe use of any assistive devices, are inconsistent with the existence of an extreme limitation on the ability to walk as required by listing 1.02(A). As noted by the ALJ, plaintiff did not use one, let alone two, assistive devices, such as canes, crutches, or walkers, as typically found in one whose walking abilities are extremely limited. *Id.*; *see* R. 254, 256–57 (reporting by plaintiff that she does not use a cane or other assistive device and could walk 200 feet before needing to stop and rest); R. 716 (treating physician source statement indicating plaintiff could stand/walk for about two hours and sit for at least six hours in a workday). Finally, the ALJ noted that plaintiff lived alone and remained mostly independent with respect to activities of daily living. R. 21.

Further, in light of the treatment notes and history discussed above, the ALJ's credibility determination about plaintiff's overstatement of the intensity, persistence, and limiting effects of her symptoms applies with equal force here. The same is true for the ALJ's observations about

plaintiff's noncompliance with her providers' treatment recommendations.   In noting plaintiff's testimony about pain and the existence of some walking limitations and the existence of some corroboration for her complaints in the treatment records, however, the ALJ judiciously decided not to wholly discount them.   Instead, having classified plaintiff's obesity and orthopedic impairments (including arthritic knees) as severe, the ALJ also took them into account in assessing her RFC.  These conclusions are supported by the ALJ's rejection of the conclusion of state agency physicians that plaintiff could perform light work.   Rather than agreeing that plaintiff could perform work entailing a "good deal of walking," the ALJ decided that plaintiff could only perform sedentary work, with only occasional walking and standing. R. 21; see 20 C.F.R. §§ 404.1567(a), (b), 416.967(a), (b).   Based upon the foregoing, substantial evidence supports the ALJ's determination that plaintiff failed to establish and, in fact, did not suffer from an inability to effectively ambulate, as required by listing 1.02(A), such that she would be deemed disabled.

**D.     The ALJ committed no error in relying upon the VE's testimony at step four and substantial evidence supports his determination that plaintiff could return to past relevant work.**

Plaintiff also argues that the ALJ erred in finding that she could return to work previously performed "as a patient service representative (medical clerk)."  R. 23, Pl.'s Mem. 25–27.  Plaintiff contends that an apparent conflict exists between the job of "medical-record clerk" and the ALJ's RFC limitation to sedentary work and that the ALJ failed to address an apparent conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT").[26]  Pl.'s Mem. 26–27.  The

---

[26] The *Dictionary of Occupational Titles*, and its companion, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (hereinafter "DOT"), are resources used by the SSA that review occupations present in the national economy and discuss physical and mental requirements pertaining to those occupations. U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. 1991); U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (1993).

Commissioner responds that plaintiff's argument fails to distinguish between the jobs of medical clerk, a sedentary occupation, and that of medical-record clerk, a job involving light work.  Def.'s Mem. 36–37.

In *Pearson v. Colvin*, 810 F.3d 204 (4th Cir. 2015), the Fourth Circuit reviewed SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000), and the obligations it imposes upon an ALJ.  The Fourth Circuit ruled that SSR 00-4p requires an ALJ:  (1) to inquire of a VE whether the VE's testimony conflicts with job information contained in the DOT; (2) to also independently identify whether any apparent conflicts exist between the evidence supplied by the VE and the DOT; (3) to seek, with respect to any apparent conflicts identified, an explanation from the VE for any such conflict; and (4) to address whether the VE's "explanation is reasonable and provides a basis for relying on the [VE's] testimony rather than the [DOT]."  *Pearson*, 810 F.3d at 208–11.

Here, in reviewing plaintiff's past work history, VE Edith Edwards identified the relevant position as a "medical clerk," noted that plaintiff described it as a "patient service representative," and classified it as sedentary, semi-skilled work.  R. 50.  In responding to the ALJ's hypotheticals relating to someone of plaintiff's background and with her RFC, VE Edwards testified that such a person could work as a patient service representative/medical clerk "consistent with the DOT and the [selected characteristics of occupations] for that job."  *Id.*  Upon repeated questioning, VE Edwards confirmed that her testimony was "consistent with information contained in the [DOT]."  R. 51.  After noting the VE's testimony in his decision, the ALJ also independently concluded that such was "consistent with the DOT and is accepted in accordance with SSR 00-4p."  R. 24.

Plaintiff claims error by pointing to the DOT classification for a "medical-record clerk," code number 245.362-010, and its classification of such work as "light," and arguing that a discrepancy exists between the VE's testimony and the DOT that the ALJ failed to analyze.  Pl.'s

Mem. 26–27.   As noted by the Commissioner, however, plaintiff mistakenly focuses upon a

position other than the one addressed by the VE and the ALJ.   The latter position at issue, hospital-

admitting clerk, alternatively known as, among other titles, medical clerk, is found at DOT code

number 205.362-018, and is described as follows:

> 205.362-018 HOSPITAL-ADMITTING CLERK
>
> Industry Designation: Medical Services
>
> Alternate Titles: Admissions Clerk; Clinic Clerk; Hospital-Receiving Clerk;
> Medical Clerk
>
> Interviews incoming patient or representative and enters information required for
> admission into computer:  Interviews patient or representative to obtain and record
> name, address, age, religion, persons to notify in case of emergency, attending
> physician, and individual or insurance company responsible for payment of bill.
> Explains hospital regulations, such as visiting hours, payment of accounts, and
> schedule of charges.  Escorts patient or arranges for escort to assigned room or
> ward.  Enters patient admitting information into computer and routes printed copy
> to designated department.   Obtains signed statement from patient to protect
> hospital's interests.  May assign patient to room or ward.  May compile data for
> occupancy and census records. May store patient's valuables. May receive
> payments on account.

1991 WL 671710 (4th ed. 1991).  Importantly, and consistent with the duties described above, this

job title identifies the work in question as being sedentary.  *Id.*  Also, the duties identified in the

job title correspond to those that plaintiff indicated that she performed when serving in such a

position.  R. 47, 241.

Therefore, the alleged discrepancy identified by plaintiff does not exist.   Further, as

required by *Pearson,* the ALJ inquired of VE Edwards and independently determined that no

conflicts, apparent or otherwise, existed between her testimony and the DOT.   Accordingly,

substantial evidence supports the ALJ's determination at step four that plaintiff retained the ability

to perform past relevant work as a patient service representative.

## VI.  **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's second motion for summary judgment (ECF No. 31) be **DENIED** as to counts one and two and the Commissioner's motion for summary judgment (ECF No. 33) be **GRANTED** as to counts one and two.

## VII.  **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this report to the objecting party, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

 

 

 
$$\underline{\hspace{4cm}/s/\hspace{4cm}}$$

Robert J. Krask<br>
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
January 23, 2019